IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SHANE and DONNA OCHS,

       Plaintiffs,

v.                                      Case No. 6:14-cv-01273-JTM

LOG STAR HOMES OF AMERICA, INC.;
5 STAR LOG HOMES; KEVIN HYLTON;
SALDIVAR JAVIER PUGA; JUAN PUGA;
and JCO FRAMING, INC.,

       Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on the following motions: defendant Log Homes of America's (LHA) Motion for Summary Judgment (Dkt. 102); LHA's Motion to Strike (Dkt. 114); and LHA's Motion for Sanctions (Dkt. 118). For the reasons set forth herein, the court finds that the motions should be granted.

### I. Background.

Plaintiffs Shane and Donna Ochs brought this action relating to their purchase and construction of a log home near Hoxie, Kansas. Plaintiffs allege that they entered into a "partly-written, partly oral, implied-in-fact or quasi-contract" with LHA to build the home, and that Five Star Log Homes, Kevin Hylton, JCO Framing and the other defendants "acted as employees, representatives, or agents of LHA" on the contract. Dkt. 100 at 6. Plaintiffs contend LHA breached the contract; that Hylton was negligent in his supervision of the construction and that LHA was negligent in its training and

supervision of Hylton; that defendants violated the Kansas Consumer Protection Act (KCPA) by making untrue representations about their construction services and materials; and that defendants made fraudulent misrepresentations or omissions about Hylton's qualifications to build the home.

**II. Motion to Strike (Dkt. 114) and Motion for Sanctions (Dkt. 118).**

LHA moves to strike a response brief filed by plaintiffs on October 31, 2016. It also moves for sanctions (including the striking of the brief) based on the manner in which plaintiffs' counsel obtained an extension of time to file the brief. A brief review of the circumstances is necessary to address the motions.

LHA filed its motion for summary judgment on August 18, 2016. Dkt. 103. Plaintiffs obtained an extension of time to file a response by October 7, 2016. Dkts. 104, 105. On October 7, 2016, plaintiffs filed a "final motion for extension of time" seeking until October 24, 2016, to file their response. Dkt. 106. Although LHA opposed the request, the court granted the motion with the proviso that "no further extensions will be granted." Dkt. 109.

On October 24, 2016, plaintiffs filed their response together with two attachments. Dkt. 110. The brief was 26 pages long. Two days later, plaintiffs filed a "Motion to Withdraw and Correct Brief and Supplement Attachments." Dkt. 111. The motion explained that "Plaintiffs' Counsel uploaded the Plaintiffs' Responsive Brief and it was filed… [h]owever, all the Attachments to the Brief could not be uploaded to CM/ECF and filed, for some unknown reason." Plaintiffs' counsel "tried to upload twelve other attachments and was unable to upload those items." *Id*. at 1. Counsel

explained that he "has been studying the problem and believes that he now has a solution" that involves re-scanning the items using different machines or techniques. *Id.* at 2. Counsel asserted there would be no prejudice to LHA and asked for an extension until October 29, 2016, "to correct and re-file the Plaintiffs' Responsive Brief and reconfigure and supplement the Attachments in proper format…." *Id.* at 2-3. Based on these representations, the court granted the motion and gave plaintiffs an extension of time until October 31, 2016. Dkt. 112.

On October 31, 2016, plaintiffs filed a response brief with fourteen attachments. Dkt. 113. This brief was 46 pages long - about twenty pages longer than the initial brief. LHA argues that counsel's request to file the response was for the improper purpose of obtaining an extension of time by deception, that counsel violated Rule 11, and that sanctions should be imposed. Dkt. 118 at 2-4. In response, plaintiffs' counsel asserts that LHA suffered no prejudice from the filing. Counsel denies that he acted in a deceptive manner, pointing out that the motion requested permission to "withdraw and correct" the brief as well as to supplement the attachments. Thus he contends, "[t]he correction and refiling of a brief is clearly described as one part of the relief sought in the motion." Dkt. 117 at 2. Counsel explains his state of mind as follows:

> 21. Caleb Boone did desire to correct the brief. That relief was requested. But, the formation of the desire to correct the brief occurred after-the-fact and the request for that relief was not pre-planned or contrived in advance.
>
> 22. The relief of permission to correct the brief was requested only due to the fact that the opportunity arose for that to occur, but the request was made after-the-fact of the electronic blockage. The request for permission to correct the brief was not planned in any way at all.

> 23. As a result of inquiry after the electronic blockage occurred, Caleb Boone formed his desire to correct the brief and determined that correction of the Plaintiffs' Response might possibly be requested, and could be accomplished reasonably and prudently without any prejudice to the Defendants.

Dkt. 119 at 3.

Rule 11 provides in part that by presenting a motion to the court, an attorney certifies to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the motion is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b).

The representations in Mr. Boone's motion, when considered in the light of his conduct, were misleading at best. The motion came shortly after the court informed counsel that no further extensions of time to file the response would be granted. The motion represented that counsel was able to file the response brief on time, but he needed a short extension merely to overcome a technical glitch in filing the attachments. The court granted the extension on that basis. Having obtained the extension, counsel proceeded to extensively revise the brief. Counsel claims this was not deceptive because his motion included a request to "withdraw and correct [the] brief." But in the context of counsel's explanation indicating only that he encountered technical problems in filing the attachments - the solution to which involved "re-scanning the items"- the inclusion of a request to "correct and re-file" the brief cannot be taken as asking for time to substantively overhaul the brief. *See* Dkt. 111 at 2-3 (asking for short extension "to correct and re-file the Plaintiffs' Responsive Brief and reconfigure and supplement the

4

Attachments in proper format and upload and file them….”). Nothing in Mr. Boone's motion gave fair warning that he was asking for more time to rewrite his brief. It is hard to view this as anything other than misleading the court in order to obtain an extension that would not have otherwise been granted. Counsel's explanation (Dkt. 119 at 3) only muddies the water, as it is nearly indecipherable. It does nothing to dispel the court's conclusion that counsel misrepresented the purpose of the requested extension. Viewed objectively, counsel's representations and conduct evince a purpose to improperly obtain an extension of time through a misrepresentation or half-truth. The court finds that this conduct violated Rule 11(b)(1). *See Drain v. Accredited Home Lenders, Inc.*, 219 F.App'x 791, 2007 WL 756438, *4 (10th Cir. Mar. 14, 2007) (attempting to mislead the court was sanctionable under Rule 11).

A sanction under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The touchstone for determining the amount of sanctions under Rule 11 is deterrence rather than compensation." *Clemens v. Wells Fargo Bank, N.A.*, No. 14-4020-JTM, 2015 WL 3796042, at *3 (D. Kan. June 18, 2015). After considering the arguments, the court concludes that striking plaintiffs' revised response brief (Dkt. 113), but not the attachments thereto, represents the minimum sanction likely to be effective. LHA's motions to strike and for sanctions are granted to that extent. The court will consider plaintiffs' timely-filed initial response brief (Dkt. 110) in connection with LHA's summary judgment motion.

### III. LHA Motion for Summary Judgment (Dkt. 102).

A. *Uncontroverted Facts*. The court finds the following facts to be uncontroverted for purposes of summary judgment. In determining the uncontroverted facts, the court has been hampered by plaintiffs' failure to abide by D. Kan. R. 56.1, including the obligation to refer with particularity to the portions of the record relied upon and to respond in a way that fairly meets the substance of the matter asserted. Plaintiffs' response fails to directly address a multitude of facts asserted by LHA, and instead repeatedly sets forth the same collection of allegations in response to LHA's various asserted facts.

LHA is located in Jefferson, North Carolina. It has only a few employees. It manufactures log home components for construction of the outer shell of log homes, often called "kits." During the past 21 years, LHA has never engaged in construction or assembly of the kits.

LHA has a network of "representatives" who purchase the kits that it manufactures. LHA considers the representatives to be independent of LHA. The representatives enter into contracts with individual purchasers for sale of kits. Outside of North Carolina, LHA does not normally sell its kits directly to individual purchasers, although it has done so on occasion in areas where LHA does not have a representative.

LHA does not pay its representatives any commissions. The representatives are free to charge whatever price they want for the materials they resell. The representatives keep the difference between the price they pay LHA for the materials and the resale price to individual purchasers.

LHA does not send out a brochure or any kind of educational or sales guides to its representatives. It does not hold sales or other meetings with its representatives. Nor does it have any program for training representatives in the correct construction or building techniques required to build a sound log home from LHA kits.

LHA does not require its representatives to attend training on how to sell its products. Nor are the representatives required to exclusively sell LHA products; they can sell products from other log home manufacturing companies.

Kevin Hylton is a representative who sells LHA building supplies through his business Five Star Log Homes. LHA contends that Hylton has no authority to speak on its behalf.

Defendants Saldivar and Juan Puga are owners/operators of defendant JCO Framing, Inc.

When plaintiffs decided to build a log home, they spent hundreds of hours researching log home companies and the construction of log homes, including reviewing websites and other online materials, as well as meeting with representatives of various log home companies.  Based on their research, they understood that some log home manufacturers only provide blueprints and a kit of materials, while others construct and provide a turnkey home.

Plaintiffs created a floor plan or design for their home, which they submitted to various log home manufacturers.

Plaintiffs attended an outdoor trade show in Oklahoma City in December of 2011. They brought their floor plan with them. On their way out, they visited the Five Star Log Homes booth and met with the company's owner, Kevin Hylton.

After the trade show, plaintiffs met with Hylton a few times in person and had discussions with him over the telephone and via email. Hylton provided several quotes to plaintiffs for the materials to construct the outer shell of their log home. All of these quotes were from Five Star Log Homes, Hylton's company. None of these quotes was from LHA, nor did LHA contact plaintiffs to discuss any of the quotes.

Plaintiffs contracted with Hylton for the purchase of the logs to construct the outer shell of their home. They had no separate contract with LHA. Plaintiffs submitted their payments for the logs and other materials manufactured by LHA, including their ten percent down payment and payment for the balance of the materials, directly to Hylton. They purchased blueprints directly from LHA because they wanted to use a credit card to pay for them, and Hylton was not set up to take credit card payments. LHA provided its materials quote to Hylton based upon the information provided to it by Five Star Log Homes.

After the logs were delivered, on August 22, 2012, Donna Ochs received an email from Nicole Robinson of LHA. The email stated that "[y]our invoice appears below. Please remit payment at your earliest convenience." Dkt. 113-3. The invoice attached to the email indicated that LHA was billing Kevin Hylton of Five Star Log Homes in the amount of $93,290.90. Dkt. 113-3 at 2. Plaintiffs at that point had given Hylton a check for the balance. (An invoice from Five Star Log Homes dated August 8, 2012, indicates

Five Star billed plaintiffs on that date for $93,291.70. Dkt. 113-3 at 3. The invoice bears a hand-written acknowledgement from Hylton indicating that the invoice was paid by a check from plaintiffs on August 11, 2012. *Id*. When Donna Ochs received the email from LHA, she went directly to Hylton, wanting to know why LHA hadn't been notified that he had already received their check. Dkt. 113-1 at 2. Hylton said he would take care of it immediately. *Id*. Plaintiffs understood that Hylton was using their payment to pay LHA. Nicole Robinson of LHA testified that the body of her email to Donna Ochs was computer-generated and that she believes Ochs asked her to provide a copy of the invoice.

A few weeks after Hylton sold plaintiffs the materials to construct the outer shell of their home, they asked him to supervise the construction of the shell. Hylton agreed to do so. Hylton did not get any input or guidance from LHA regarding his supervision of the construction. Plaintiffs had no written contract with any of the defendants for the construction of the home.

Hylton provided plaintiffs with a list of four or five potential contractors for their home. According to plaintiffs, Hylton recommended JCO and said that LHA had a long association with them. No one from LHA told plaintiffs about JCO or their workmanship. Plaintiffs investigated the contractors. Plaintiffs concede they had a free and independent choice and could have found a construction company other than the ones mentioned by Hylton.

Plaintiffs hired defendant JCO to construct the outer shell. Hylton understood that plaintiffs hired JCO because they could not find a local contractor. Plaintiffs

received invoices directly from JCO and paid JCO directly for its work on the home. Plaintiffs hired all of the other subcontractors other than JCO who performed work on the home without any input from Hylton. Plaintiffs paid all of the subcontractors directly.

Shane Ochs took the blueprints to lumberyards and asked them to call out the materials needed for framing and other work on the home, i.e., materials other than the shell log kit. JCO did not bring or provide any materials.

Plaintiffs broke ground on the home in approximately August 2012. The last time Hylton was on the job site was October 2012. When he left, about two-thirds of the construction remained to be completed. Hylton did not supervise any of that work. Construction was completed in April 2013. Plaintiffs have continuously lived in the home since May 2013.

LHA had no contact with any of the construction crew members who constructed plaintiffs' home. It has no knowledge of which crews Hylton may have recommended to plaintiffs.

Plaintiffs did not enter any contracts with LHA. Shane Ochs never spoke with anyone from LHA until after the home was built. The first time Donna Ochs spoke to anyone from LHA was after the logs were delivered to the site. The next communication she had with LHA was after Hylton left the job, and that was regarding sealant that Hylton had applied to the logs inside the home. Plaintiffs claimed to have problems with the way Hylton applied the sealant and contacted LHA to order additional sealant and stain materials so the materials could be reapplied. Ochs talked

to LHA president Joel Robinson, who did not tell her that Hylton was not an agent or employee of LHA. The next time she had any communication with LHA was when she contacted them around July 2014 to complain about leaks in the home. Shane Ochs also called LHA a week or so prior to July 12, 2014, to complain about leaks.

The blueprints and the additional stain and sealant were the only materials plaintiffs ordered directly from LHA.

LHA never told plaintiffs that Hylton was its agent or partner or that they were in a joint-venture. Plaintiffs understood that LHA and Five Star Homes were separate companies. Plaintiffs understood when reviewing the LHA website that they could purchase LHA products through Five Star Log Homes.

Hylton did not tell plaintiffs that any of the JCO crew were his employees. Plaintiffs have no documents indicating JCO was affiliated in any way with LHA. The basis for plaintiffs' claim that JCO, Saldivar Puga, and Juan Puga are agents, servants, or joint venturers of LHA is their claim that LHA authorized Hylton to act as its agent and knowingly allowed him to supervise construction of plaintiffs' home, thereby placing its "stamp of approval" on Hylton, and Hylton in turn recommended JCO.

LHA has a website that includes information about LHA representatives. A portion of the LHA website entitled "Find A Rep" included a listing for "Five Star Log Homes." It set forth Five Star's address in Chelsea, Oklahoma; and its phone number, website, and email address. It stated: "Five Star Log Homes has recently relocated to the Ok[lahoma] area. The owner Kevin Hylton has been working in [log] home sales and service for more than five years under the tutelage of our company founder Charlie

Maney. Kevin is a hands on guy and experienced in all the facets of log homes. He is thorough and dedicated and ready to help you bring your log home from a dream to a reality. Give him a call today."

Maney was the founder of LHA. He remained a shareholder in LHA at all times relevant to this suit. Around 2001, Maney retired from active management of LHA and Maney's son-in-law Joel Robinson became president of LHA. Around that time Maney established a company called Still Water Log Homes, which sold log home kits to residential purchasers. Around 2001, Kevin Hylton was a neighbor of Maney's in Cumberland, Virginia, and he and Maney became friends. Hylton began working for Still Water Log Homes as a salesman. He would be paid a commission when he arranged a sale. When Maney sold log home kits at Still Waters, he sometimes recommended particular builders or crews to the purchaser when they did not have a builder and did not plan to construct the home themselves. Hylton worked for Still Water Log Homes for about five or six years.  Around 2006, Hylton became an LHA distributor or dealer in Oklahoma.

At some point after Hylton agreed with plaintiffs to supervise or monitor construction of their shell, he had a phone conversation with Charlie Maney and informed him that he would be out on the site for a little while because the plaintiffs "just wanted someone out here and they're willing to pay me what I was making on the

other job so I'm okay." Dkt. 113-9 at 15-16. Maney responded, "Okay."[1] The "other job" Hylton was referring to was his full time job as a maintenance worker.

Hylton testified it was possible that he told LHA's president, Joel Robinson, prior to the start of construction on plaintiffs' home about his agreement with the plaintiffs to stay at the building site and monitor the builders.

Shane Ochs testified they selected Kevin Hylton because his biography on the LHA website "paints him as more of a - he's not just a salesman," "he's got lots of knowledge, lots of experience," "more than I would expect from just selling some logs," and with LHA touting Hylton as a representative and highlighting his training from Charlie Maney, "I felt really good about it or felt like … we were getting an exceptional representative" and "a quality product."

Plaintiff's expert witness, Frank Comer, has offered an opinion that the cost of repairing deficiencies in the Ochs' home is approximately $358,000. This estimate was based on conversations with a general contractor.

B. *Summary Judgment Standards.*

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury

---

[1] Plaintiffs assert that "Maney agreed Kevin should proceed to undertake to supervise the building of the Ochs' home." Dkt. 110 at 3. This is a mischaracterization of Maney's testimony explaining what Hylton told him over the phone. Maney testified: "He says: They just want somebody else here – [Q. Okay.] – they just want somebody else here so I agreed." Dkt. 113-9 at 15. The context makes clear that Maney was recounting that *Hylton* said he had agreed to stay on site, not that Maney agreed Hylton should do so. *See e.g.,* Dkt. 113-9 at 19.

to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits — conclusory allegations alone cannot survive a motion for summary judgment. *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal–Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)). The court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

    C. *Discussion.*

    1. Breach of contract.

Plaintiffs claim they had a contract with LHA "to build a completed finished log home" for plaintiffs. Dkt. 100 at 6. LHA contends that plaintiffs cannot prevail on this claim because there was no meeting of the minds and LHA never agreed to provide plaintiffs with construction or supervision services. It further argues plaintiffs cannot show that Kevin Hylton was LHA's agent because there was no express agency and plaintiffs' evidence is lacking as to any implied or apparent agency. Dkt. 103 at 17-23. In response, plaintiffs argue that Hylton was an impliedly authorized agent of LHA because "he was allowed to use the logo of LHA freely to accomplish his transactions

with the Plaintiffs," and because Nicole Robinson "pressed the Plaintiff Donna Ochs for payment of the logs using documents which had the logo of LHA on them, as affixed by Kevin Hylton." Dkt. 103 at 20. Plaintiffs also contend that LHA's promotion of Hylton on its website reflects an agreement "for LHA to train, prepare and provide Kevin Hylton as a careful and competent construction job supervisor to assure the quality of the work performed by JCO Framing." *Id*. at 22.

In order to state a claim for breach of contract under Kansas law, one of the elements the plaintiff must establish is the existence of a contract between the parties. *Feldt v. Kan-Du Const. Corp.*, No. 12-1064-MLB, 2014 WL 4725245, at *2 (D. Kan. Sept. 23, 2014)[2] (*citing Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.,* 265 F.Supp.2d 1179, 1187 (D.Kan.2003)). "Three elements create a contract: offer, acceptance, and consideration. Additionally, in order for parties to form a binding contract, the offer and acceptance must manifest a mutual assent or a 'meeting of the minds' on all the essential terms of the contract." *Howard v. Ferrellgas Partners, L.P.*, 92 F. Supp. 3d 1115, 1124 (D. Kan. 2015) (citation omitted). The "'meeting of the minds' requirement is proved when the evidence shows with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Id*. (citations and internal quotation marks omitted).

The uncontroverted facts will not support a finding of the existence of an agreement between plaintiffs and LHA concerning construction of the log home. Aside

---

[2] Appeal dismissed (July 23, 2015), aff'd sub nom. *Feldt v. Heritage Homes of Nebraska, Inc.*, 655 F. App'x 669 (10th Cir. 2016).

from Hylton's oral agreement with LHA, there is no evidence of any independent agreement on LHA's part to oversee construction of plaintiffs' home. For example, even assuming that the LHA invoice requesting payment was not sent to Donna Ochs at her request, such conduct by LHA does not evince an agreement on LHA's part to supervise construction of the house. It shows nothing more than a request for payment of the materials delivered.  The fact that LHA's logo may have appeared on the invoice or on other documents is likewise insufficient to show that these parties had an agreement regarding construction of the home. *See Walsh v. Maryland, Bank, N.A.*, No. 91 Civ. 7483(CSH), 1994 WL 132234, at *2 (S.D.N.Y. Apr. 14, 1994) (granting summary judgment on plaintiff's breach of contract claim against MasterCard because it was not a party to the contract although its logo appeared on it).

Plaintiffs' contract claim is thus entirely dependent upon a showing that Hylton's agreement with plaintiffs to oversee construction was binding on LHA. But plaintiffs fail to cite evidence raising a genuine issue on that point. They cite no evidence that Hylton was expressly authorized by LHA to undertake such an agreement on its behalf. As for implied agency, that status may exist "if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal." *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 957, 335 P.3d 1178, 1189 (2014) (cite omitted). Plaintiffs cite no evidence from which a reasonable jury could conclude that LHA and Hylton intended to create such a relationship.

16

Finally, as to apparent authority, Kansas law provides that "[a]n ostensible or apparent authority may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent, even though no authority, either express or implied, has been actually conferred upon the agent." *Nat'l Bank of Andover v. Kansas Bankers Sur. Co.*, 290 Kan. 247, 271, 225 P.3d 707, 723–24 (2010). *See also Golden Rule Ins. Co.*, 300 Kan. at 956 ("[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." (*citing* Restatement (Third) of Agency § 2.03 (2005)). But plaintiffs have failed to cite evidence showing that a belief that Hylton was overseeing construction as LHA's agent was attributable to LHA's representations or manifestations. Plaintiffs admit they understood that Hylton's Five Star Log Homes and LHA were separate entities and that they were purchasing the LHA log home kit from Five Star. To support their claim, plaintiffs cite Hylton's alleged use of the LHA logo on some of his papers. But use of the logo alone does not imply anything beyond what plaintiffs admittedly understood – i.e., that Five Star was an entity that was authorized to sell LHA log home kits. *Cf. Sine Enterprises, Inc. v. Jaguar Cred. Corp.*, 139 F.3d 912 (Table), 1998 WL 88156, *5 (10th Cir. Feb. 26, 1998) (The existence of a logo does not, in and of itself, establish the existence of an agency relationship under the guise of apparent authority). *See also In re Motor Fuel Temp. Sales Practices Litigation*, 2012 WL 1536161, *7 (D. Kan. Apr. 30, 2012) (A

franchisee's use of a franchisor's marks alone is insufficient to establish apparent agency).

The other fact emphasized by plaintiffs was the promotion of Five Star Log Homes on the LHA website. Five Star was listed as a new representative in Oklahoma, whose owner had worked in "sales and service" under the tutelage of LHA founder Charlie Maney. Although the website said Hylton was knowledgeable in "all facets of log homes," it did not hold him out to be a builder or expert in log home construction, nor did it imply that he was authorized to supervise construction of log homes on LHA's behalf. Plaintiffs were aware that with "some [manufacturers] you're supposed to go find a builder or it stops there with the kit," while others go "all the way to turnkey." Dkt. 113-5 at 11. Their asserted beliefs that Hylton had experience in building log homes and that he supervised construction as an agent of LHA are not traceable to manifestations from LHA. The LHA website's promotion of Five Star Log Homes cannot serve as the foundation for a claim that Hylton had apparent authority to bind LHA on an agreement to supervise construction of plaintiffs' house.

2. <u>Negligence</u>. Plaintiffs allege that LHA negligently "undertook to train, educate, qualify, and prepare Hylton to be the construction site supervisor for plaintiffs' home." Dkt. 100 at 7. They claim that LHA was negligent in its design of the log home and in "recommending Hylton as an excellent log home builder." *Id*. at 10. Plaintiffs assert that Hylton was negligent in his supervision of construction and that LHA negligently selected, trained and supervised Hylton in his capacity as an agent of LHA.

Plaintiffs' response refers generally to the report of its expert, Frank Comer, and asserts that "[t]his is sufficient evidence of home construction negligence, negligent training of Kevin Hylton and negligent recommendation of Kevin Hylton by LHA through its website[.]" Dkt. 110 at 22-23.

"In Kansas, a plaintiff must prove the following four elements to sustain a negligence cause of action: (1) plaintiff is owed a duty by defendant; (2) defendant breached the duty; (3) plaintiff sustained damages; (4) damages were proximately caused by the breach." *Feldt*, 2014 WL 4725245, at *5 (*citing P.W. v. Kansas Dept. of Soc. & Rehab. Serv.,* 255 Kan. 827, 831, 877 P.2d 430 (1994)).

Plaintiffs' multiple allegations of negligence fail for a variety of reasons. Plaintiffs' allegation that LHA negligently selected or trained Hylton fails because plaintiffs identify no basis on which LHA owed them a duty to exercise care in performing such tasks. *See Feldt*, 2014 WL 4725245, at *5 ("Actionable negligence must be based on a breach of duty.") (cite omitted). With respect to their claim of negligent design, they fail to identify specific evidence showing a genuine issue as to whether LHA breached a duty of care in the home's design that resulted in their damages. Plaintiffs' assertion that evidence of negligent design will be found somewhere within their expert's 13-page expert report is not a sufficient response to summary judgment. Their claim that LHA negligently recommended Hylton "as an excellent home builder" fails because they cite no evidence that LHA recommended Hylton as a builder, excellent or otherwise. The representations about Hylton on the LHA website cannot be reasonably construed as a representation that Hylton had experience in building log

homes. The claim that LHA negligently supervised Hylton fails because plaintiffs have not produced evidence that Hylton was an agent of LHA for purposes of supervising the construction. Similarly, the claim that LHA is vicariously responsible for Hylton's alleged negligent supervision of the construction fails because plaintiffs have not cited evidence that Hylton was acting as LHA's agent in supervising the construction.

   3. Fraud/Negligent Misrepresentation.   Plaintiffs allege that Hylton made a number of misrepresentations, including that "our building and construction services are excellent" and that "we will supervise the construction of your home and see to it that it is an excellently-builty, fully assembled log home." Dkt. 100 at 13.  LHA's motion for summary judgment is granted with respect to the alleged misrepresentations by Hylton, because plaintiffs have failed to cite evidence establishing that Hylton was acting as LHA's agent or that LHA is otherwise vicariously responsible for his conduct.

   As for the representations about Hylton on the LHA website, plaintiffs fail to show a genuine issue as to whether they were false or misleading. Plaintiffs' allegations in the Pretrial Order recount these representations but do not explain how they were false. Dkt. 100 at 13-14. Insofar as plaintiffs claim that LHA misrepresented Hylton as an experienced builder, the court rejects that construction, as the only concrete description of Hylton's work experience on the website was the assertion that he had worked in log homes "sales and service," which does not reasonably imply that he was a home builder or a construction supervisor. Plaintiffs also claim LHA committed fraud by not disclosing that Hylton had no experience as a log home builder, but they fail to show

that LHA owed a duty to them to make such a disclosure. In sum, LHA is entitled to summary judgment on all of plaintiffs' claims of fraud and negligent misrepresentation.

4. <u>KCPA Claims</u>. Plaintiffs contend they have a valid KCPA claim based upon the evidence of fraud. Dkt. 110 at 24. As noted above, however, the court finds that plaintiffs have failed to cite evidence of actionable fraud. Insofar as plaintiffs allege that LHA falsely represented that its "construction services and materials would consist of the completion of the building of plaintiffs' home," Dkt. 100 at 11-12, such a claim fails for the same reasons stated previously in this order, including the absence of any showing that Hylton had authority to bind LHA on his agreement to supervise construction of the home.

5. <u>Punitive Damages</u>. Inasmuch as the court has found that LHA is entitled to summary judgment on all of plaintiffs' causes of action, LHA is also entitled to judgment on plaintiffs' claim for punitive damages. *See Wendt v. Univ. of Kan. Med. Ctr.*, 274 Kan. 966, 982, 59 P.3d 325 (2002) ("A verdict for actual damages is essential to the recovery of punitive damages.").

**IT IS THEREFORE ORDERED** this 15th day of December, 2016, that defendant Log Homes of America's Motion for Summary Judgment (Dkt. 102), Motion to Strike (Dkt. 114) and Motion for Sanctions (Dkt. 118) are GRANTED.

___s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE
